

# NUMBER 13-19-00126-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

## IN THE INTEREST OF A.J.S., A CHILD

### On appeal from the County Court at Law No. 5
### of Nueces County, Texas.

# MEMORANDUM OPINION
### Before Chief Justice Contreras and Justices Benavides and Longoria
### Memorandum Opinion by Justice Benavides

By two issues, appellant C.S. challenges the termination of her parental rights to A.J.S.[1]  *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (F), (M), (O), (P).  Mother argues that the evidence is insufficient to support the trial court's findings on any of the enumerated grounds and is also insufficient to support a finding that termination was in the best interest of A.J.S.  We affirm.

---

[1] To protect the identity of the minor child who is the subject of this appeal, we refer to the parties by their initials.  *See* TEX. FAM. CODE ANN. § 109.002(d); TEX. R. APP. P. 9.8.

## I.     BACKGROUND

In June 2017, the Department of Family and Protective Services (the Department) filed an original petition for temporary conservatorship of A.J.S., for removal on multiple grounds, and to terminate both parent's rights.[2]   *See id.* § 161.001(b)(1) (A)-(G), (I)-(K), (M)-(S).

## A.     Removal of A.J.S.

The affidavit in support of the petition advised the court that on June 15, 2017, the Department located A.J.S. in the care of a man, later determined to be a registered sex offender, and a woman, both of whom appeared under the influence of drugs or alcohol. A.J.S. had been left in their care by Mother.   They did not know Mother's whereabouts and the Department was not able to reach Mother by telephone.   The affidavit also recited the details of the Department's investigation and Mother's history with the Department.

The Department provided services to Mother and her boyfriend M.P. since before February 2017.   During February and March 2017, the caseworker was not able to contact Mother despite multiple attempts.   On April 1, 2017, the caseworker contacted Mother who explained that she stopped cooperating with the Department because she felt threatened by the Department's investigator.   Mother and M.P. agreed to continue to follow the current plan until they could appear before the judge.   There was a safety plan that precluded M.P. from having contact with A.J.S.   Mother and M.P. were known to use drugs and were minimally cooperative with the Department.

---

[2] Father did not contest termination of his rights and he is not a party to this appeal.

There was a hearing on April 6, 2017. Mother, who was not present due to illness, was ordered to participate in individual and family counseling, parenting classes, and random drug testing.

On May 9, 2017, the caseworker contacted Mother who stated that she was back on some of her mental health medications but needed to follow up with her doctor before getting the remaining medications.

On June 14, 2017, a caseworker assistant contacted R.S., Mother's cousin, at his home. Mother lived with R.S. until three weeks earlier when she moved out with A.J.S. and R.S. had not heard from her since. Before Mother moved, she took A.J.S. to visit M.P. regularly and tried to bring M.P. to R.S.'s house. However, R.S. enforced the safety plan that prevented M.P. from being around A.J.S., and Mother did not like that. According to R.S., when Mother left she was sweaty and did not look well, as if she was using drugs. The caseworker assistant telephoned Mother, but the call went straight to voicemail. The Department caseworkers checked with Mother's friends who denied that she was at their house, although they admitted that Mother and M.P. had been together around A.J.S.[3]

On June 15, 2017, one of Mother's friends telephoned the case worker and reported that she had A.J.S. Before the caseworker could arrive, Mother and M.P. picked up A.J.S., and left on foot. A few hours later, when the caseworker and police came back, A.J.S. was there but Mother and M.P. were gone. A background check on the friends revealed that the couple had a history with the Department which had removed

---

[3] M.P. was originally before the trial court as Mother's boyfriend. At the time A.J.S. was removed, M.P. was living separately from them due to a court-ordered safety plan as a result of his drug use. Once Mother eventually got sober, M.P. dropped out of the case.

3

their children.

Mother's history with the Department began in 2005 when a report was filed alleging that Mother was neglecting a different child, A.B. Mother was homeless, diagnosed with bipolar disorder and OCD, and was also using drugs. Because the Department could not find Mother, it was not able to act on the report. In May 2006, the Department received another referral alleging neglect of A.B. Mother was inconsistent with visitation and only minimally participated in services.

In July 2008, the Department received another referral alleging physical abuse of A.B. and another child, S.M. Mother and her boyfriend were allegedly hitting the children and using drugs while caring for the children. Mother tested positive for cocaine and the boyfriend was arrested for possession of a controlled substance. Mother completed parenting classes but did not make any progress in counseling and did not attend out-patient drug treatment. In March 2009, S.M. and A.B. were transferred to the temporary custody of the Department. Mother's parental rights to S.M. and A.B. were terminated in March 2010. A.B. and S.M. were adopted by their maternal grandmother, S.S.

In November 2016, the Department received a referral alleging physical abuse and neglectful supervision of A.J.S. The referral alleged that Mother allowed M.P. to be the primary caretaker for A.J.S. while Mother was working. M.P. tested positive for methamphetamine and had a history of mental health issues. Initially Mother was cooperative but disappeared when the Department requested hair follicle testing.

Mother has a low-level criminal history that includes two felony convictions on January 9, 2009, for drug related offenses.

4

A.J.S. was placed in foster care after her removal on June 6, 2017. An adversary hearing was held on June 29, 2017. The trial court ordered Mother to comply with the service plan, to participate in two weekly visitations with A.J.S., and also ordered hair and urinalysis testing for both Mother and M.P.

**B.    Interim Court Proceedings**

A progress report to the trial court dated July 31, 2017 stated that A.J.S. was eleven months old and the service plan was directed to family reunification. Under the service plan, Mother was to maintain contact with the Department, complete a psychosocial assessment, complete parenting classes, successfully complete alcohol and drug assessment, have two weekly supervised visits with A.J.S., and comply with random drug testing. M.P. had similar requirements. At the time of the status report, Mother had not maintained consistent contact with the Department, although she had completed her psychosocial assessment and was attending individual and family counseling with M.P. Mother attended parenting classes and the Department was expecting to receive a certificate of completion. Mother's attendance at visitation was inconsistent and she often did not confirm that she would attend. Random drug testing was pending because Mother did not have a telephone.

The trial court prepared a status hearing order after the August 14, 2017 hearing that maintained the status quo. Family reunification was still the Department's goal.

According to a status report filed by the Department on October 13, 2017, Mother had completed six out of the required thirty-six hours of substance abuse group classes and four of the sixteen recommended individual counseling hours. M.P. had attended only two of the thirty-six group hours and five of the recommended sixteen individual

counseling hours. Mother was not employed and needed one more hour to complete her general mental health counseling. Neither Mother nor M.P. had complied with the order for hair and urine drug testing. Mother was not consistent with visitation with A.J.S. The Department recommended that visitation be cancelled until after Mother complied with the hair and urine drug testing.

On October 12, 2017, the trial court held a status hearing. In its order filed February 5, 2018, the trial court found that Mother is not "willing and able to provide [A.J.S.] with a safe environment, and therefore return of the child to a parent . . . is not in the child's best interest. The child continues to need substitute care and the child's current placement is appropriate for the child's needs." The trial court ordered hair follicle and urinalysis drug testing on October 12, 2017 before visitation resumed.

The Department filed a permanency report with the trial court on December 13, 2017, six months after A.J.S. was removed. A.J.S. was one year old and in foster care. Mother did not have stable housing but had completed her individual and family counseling and attended parenting classes. Mother still did not consistently confirm visits with the Department. The permanency goal had changed to unrelated adoption with reunification ruled out "as [Mother] has not been compliant with the Department and has not shown a life style change; [Mother] has not maintained a stable home, is not consistent with her visitations and substance abuse counseling." According to the permanency report, A.J.S was healthy and happy in her placement with no medical concerns and no medication prescribed. Although Mother had made progress, she had not completed her substance abuse counseling six months after A.J.S. was removed. She last attended individual counseling on November 6, 2017, and last attended group

6

counseling on November 4, 2017.   Mother was hospitalized in late November for at least four days.   Mother also missed three out of seven scheduled visitations between October 12, 2017, and November 27, 2017.

Mother tested positive for methamphetamine on the hair follicle test on June 16, 2017, but her urinalysis was negative.   On October 13, 2017, her hair follicle test was positive for amphetamines, but the levels were much lower.

M.P.'s June 16, 2017 hair follicle test was positive for amphetamine.   His hair follicle test for October 13, 2017 was also positive for amphetamine and methamphetamine.

The trial court held an initial permanency hearing on December 13, 2017.   The trial court found that Mother "has not demonstrated adequate and appropriate compliance with the service plan."   The trial court further found that the "Department has made reasonable efforts, as identified in its service plans and or Permanency Progress Reports, to finalize the permanency plan that is in effect for each child."

On February 15, 2018, the trial court held a conservatorship hearing at which it modified Mother's visitation to permit unsupervised visitation for two hours, twice a week. The trial court made no other changes.

In March 2018, after three weeks of unsupervised visitation, the Department requested a change.   During that time, Mother moved out of the women's shelter and did not notify the Department when she moved.   For each visitation, Mother requested that A.J.S. meet her at a different location.   According to the social worker, when A.J.S. returned from visitation, her clothes were "dirty, stained, and ha[d] a strong stench of cigarette smoke."   The Department requested Mother drug test on March 26, 2018, but

she did not. On March 26, 2018, Mother was at a new address, but the apartment residents did not allow the Department to enter the apartment and they refused to give their names to the Department worker. A.J.S. was picked up from the apartment which had "a strong odor of cigarette smoke resulting in [A.J.S.] having that odor on herself." Mother explained that she had been at that apartment for a week and was being paid to babysit children in that apartment. The Department requested a return to supervised visitation.

A permanency hearing was held on April 11, 2018. The trial court found that Mother "has not demonstrated adequate and appropriate compliance with service plan" and that Mother is not "willing and able to provide [A.J.S.] with a safe environment, and therefore return of the child to [Mother] is not in the child's best interest." Visitation and foster placement remained status quo. The dismissal date of June 18, 2018 was noted with another hearing set for May 9, 2018.

Mother had a positive hair follicle analysis on May 10, 2018, for amphetamine and methamphetamine. Her urinalysis was negative on May 11, 2018.

On July 17, 2018, the trial court conducted a review of A.J.S.'s conservatorship. The trial court found that Mother is not "willing and able to provide [A.J.S.] with a safe environment, and therefore return of the child to [Mother] is not in the child's best interest." The trial court ordered status quo to remain and ordered Mother to appear for hair and urinalysis testing the day after the hearing.

On August 15, 2018, Mother's hair follicle test was positive for methamphetamine. Her hair follicle test in September 2018 was negative. Because Mother had a positive drug test, she was required to complete a relapse prevention plan which she did in

8

October 2018. A Family Service Plan Evaluation held in November 2018 resulted in some changes but the Department's permanency goals continued to be adoption, not reunification. In March 2019, Mother missed six out of seven available visitation days.

## C. Bench Trial

The bench trial began on October 17, 2018. The Department presented the primary caseworker Christina Jones. At that time, Mother was living at the Salvation Army shelter, and before that at another shelter. She was working at Goodwill part-time. Jones's testimony focused on Mother's inconsistent visitation with A.J.S., her unstable living conditions, health issues that made her unavailable to see or care for A.J.S., and the lack of support system for Mother with potential substitute caregivers if Mother was A.J.S.'s primary caregiver. Jones also testified that A.J.S. has had ongoing health issues and her doctor instructed that A.J.S. should not be around second-hand smoke. According to Jones, A.J.S.'s doctor told the Department that exposure to smoke was what caused A.J.S. to be sick all the time with allergies, coughing, and to be very congested. That information was conveyed to Mother. Yet, according to Jones, when A.J.S. came back from unsupervised visits, she smelled like cigarette smoke.

According to Mother's counsel, Mother was eligible for subsidized housing through the Salvation Army in November 2018. At the close of the hearing, the trial court admonished Mother:

> It's been a year and a half and throughout this case—I've looked at all the notes, I'm looking at all the evidence. Everything has been inconsistent. Housing has been inconsistent. Employment has been inconsistent. Visitation has been inconsistent. You tested positive. And these issues are just now starting . . . to get better. Your services are just now done. These services should have been done in the first four months of this case. . . . We've started a trial in this case to terminate your parental rights. And you're not ready yet. You're living in a shelter. Your employment

9

has been spotty . . . you know a child can't wait for you and that's what we're doing and then you're still having a chance. . . . I'm on the fence whether we should go ahead and finish this trial or continue working with you.

The trial court ordered a change of placement to prospective adoptive parents, also ordered expanded visitation for Mother, and recessed until February 13, 2019.

When the trial resumed four months later, the Department presented evidence from two treating physicians, a pediatric pulmonologist and A.J.S.'s pediatrician, Dr. Tessa Perez. In addition, A.J.S.'s maternal grandmother S.S. testified.

Both doctors testified that A.J.S. had severe persistent asthma and nonallergic rhinitis, as well as bronchitis. According to both physicians, that kind of asthma in a young child is very dangerous and A.J.S.'s is not well controlled. Both doctors testified that cigarette smoke is an irritant and a trigger for asthma and bronchospasms; even e-cigarettes emit nicotine which triggers bronchospasms. Second-hand smoke is also a trigger. Additionally, smoke stays on clothing, hair, and in the atmosphere around persons who have smoked. Both doctors urged that A.J.S. not be around second or third-hand smoke because of its detrimental effect on her asthma control. The pulmonologist saw A.J.S. once before the hearing but the pediatrician had seen her several times. Dr. Perez began treating A.J.S. on October 22, 2018 for ongoing health issues that included recurring ear infections, enlarged adenoids, chronic nasal congestion/infections, and cough. At the time of the hearing, A.J.S. was on multiple medications for her asthma and non-allergic rhinitis.

S.S. testified that she had not had a relationship with Mother, her adopted daughter, for over nine years. S.S. adopted Mother's two older daughters A.B. and S.M. after Mother's rights to them were terminated. S.S. has a good relationship with and is

10

employed by the same employer as the prospective adoptive mother. A.B. and S.M. have met A.J.S. and the three have bonded. S.S. believes that if A.J.S. goes back to Mother, A.B. and S.M. will never see A.J.S. again. S.S. also described Mother's adolescence including her drug use since eighth grade, dropping out of high-school, and the continuing lack of structure in her life. According to S.S., Mother has not kept a job for any period of time even though Mother was in her mid-thirties at the time of trial.

The bench trial resumed again two weeks later on March 1, 2019. The trial court heard testimony from Jones and the present and former foster mothers for A.J.S. Mother also testified.

According to Jones and the foster mothers, Mother's unsupervised visits with A.J.S. always resulted in A.J.S. coming home dirty, looking uncared for, and smelling like smoke. Even after supervised visits, A.J.S. came back smelling like smoke, but not to the same extent. One foster mother watched a supervised visitation and noticed that although Mother brought milk, juice, and snacks, she fed them to A.J.S. in quick succession such that A.J.S. had a stomach ache at the end of the visit. There was a time when Mother did not see A.J.S. for three weeks and A.J.S.'s chronic congestion and cough cleared up. Mother's exercise of her visitation continued to be erratic and her confirmation of visitation was also very erratic. Mother's excuses for missing visitation included that she overslept, even though someone was bringing A.J.S. to her and all she had to do was walk outside to greet A.J.S.

Mother testified that she never smoked around A.J.S. At the time of her testimony, Mother was sharing a one-bedroom apartment with Jerry V., an older man she met when they were at the same shelter. Mother and Jerry V. agreed to share the

11

apartment and expenses. They shared a bedroom in which he had a bed, Mother had a mattress on the floor, and there was a toddler bed for A.J.S. Mother assisted the older man, who had health problems, as part of her share of the expenses. Her share of the rent was $315 per month and they agreed to split utilities but they had not received the first bill. Mother was still working at Goodwill and had been there for approximately four months. She earned $7.15 per hour and had been moved from part-time to thirty-five or more hours a week. Her phone did not work unless she was in a location that had Wi-Fi. Although Mother testified that she did not smoke around A.J.S. and did not smoke in the apartment, Jones noticed full ashtrays in the apartment when A.J.S. went to visit. Mother explained that she and Jerry V. saved the cigarette butts so they could harvest any unused tobacco and roll it into cigarettes. The caseworker also pointed out that the apartment lease contained a no-smoking clause that allowed management to terminate a lease if a tenant smoked either inside or outside the apartment. Mother was not a party to the lease, although she was listed as an occupant. As a result, Jones believed that Mother's housing was still unstable.

Mother testified that she brought A.J.S.'s health issues to the attention of the Department and the foster parents early on because one of her other daughters needed tubes in her ears and to have her adenoids removed. She further testified that she had worked hard, once she got her own mental and physical health issues taken care of, to do the work necessary to get A.J.S. back and insisted she had done everything the Department asked of her.

Mother missed more than four requested drug tests since her last clean urinalysis, including those before the last day of trial. She blamed her non-compliance with drug

12

testing requests on a lack of notice and her transportation problems. She explained that because she did not have good phone access and no transportation other than by bus, she could not always comply with Department requests within twenty-four hours and she could not drug test within a nine-to-five window and still go to work. Mother testified that the walk from her apartment to the test site took forty-five minutes each way and to get to work on time she had to catch the 10:30 a.m. bus. If the caseworker called at 9 a.m. and requested drug testing, she simply could not get there and then get to work. When the Department attempted to accommodate her by extending the window of opportunity by a day, Mother still did not comply.

The trial court took termination under advisement and a few days later advised the parties that it would grant termination. The judgment was signed on March 29, 2019 and reflected termination on several grounds: §§ 161(b)(1)(D)-(F), (M), (O), (P). *See* TEX. FAM. CODE ANN. § 161.001(b)(1). The trial court also found that termination of Mother's parental rights was in A.J.S.'s best interest. *See id.* § 161.001(b)(2). This appeal followed.

## II.   SUFFICIENCY OF THE EVIDENCE

By her first issue, Mother makes a general challenge to the sufficiency of the evidence for each of the six grounds for termination.

## A.   Standard of Review

"Because the natural right between a parent and his child is one of constitutional dimensions, termination proceedings must be strictly scrutinized." *In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014) (internal citations omitted) (citing *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re G.M.*, 596 S.W.2d 846, 846 (Tex. 1980)). Due process

in these cases "requires application of the clear and convincing standard of proof." *Id.* (citing *Santosky v. Kramer*, 455 U.S. 745, 769 (1982); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002)). The family code defines clear and convincing evidence as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007. This heightened standard of proof carries the weight and gravity due process requires to protect the fundamental rights at stake. *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018).

"Because of this high evidentiary burden at trial, we have concluded that appellate review in parental termination cases also warrants a heightened standard of review." *In re N.G.*, No. 18-0508, ___ S.W.3d ___, 2019 WL 2147263, at *3 (Tex. May 17, 2019) (per curiam) (citing *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014)). "In conducting a legal-sufficiency review, the reviewing court cannot ignore undisputed evidence contrary to the finding but must otherwise assume the factfinder resolved disputed facts in favor of the finding." *In re A.C.*, 560 S.W.3d at 630. "Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true." *Id.* "If the reviewing court determines that no reasonable factfinder could form a firm belief or conviction that the matter to be proven is true, then the court must conclude that the evidence is legally insufficient." *In re J.F.C.*, 96 S.W.3d at 266.

"In a factual-sufficiency review, the appellate court must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding." *In re A.C.*, 560 S.W.3d at 631. "Evidence is factually insufficient if, in light of

14

the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.*

## B. Child Endangerment

"[D]ue process also requires a heightened standard of review of a trial court's finding under section 161.001(b)(1)(D) or (E), even when another ground is sufficient for termination, because of the potential consequences for parental rights to a different child." *In re N.G.*, 2019 WL 2147263, at *3.

The trial court found that Mother "[k]nowingly placed or knowingly allowed [A.J.S.] to remain in conditions or surroundings" and "knowingly placed [A.J.S.] with persons who engaged in conduct" "which endanger[ed] the physical or emotional well-being of [A.J.S.]" pursuant to § 161.001(b)(1)(D) and (E). *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E). To endanger is "to expose to loss or injury or jeopardize a child's emotional or physical health." *In re N.T.*, 474 S.W.3d 465, 476 (Tex. App.—Dallas 2015, no pet.). A parent may endanger a child either by acts or omissions that need not be directed at the child and it is not necessary that a child actually sustain an injury. *In re M.C.*, 917 S.W.2d 268, 271 (Tex. 1996); *In re N.T.*, 474 S.W.3d at 476. "[W]e are to consider the child's environment before the Department's removal of the child." *In re M.D.M.*, No. 01-18-01142-CV, ___ S.W.3d ___, 2019 WL 2459058, at *15 (Tex. App.—Houston [1st Dist.] June 13, 2019, no pet. h.); *see In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).

The distinction between subparts (D) and (E) is the source of the endangerment. Subpart (D) addresses the child's environment and subpart (E) addresses the conduct of

the persons around the child.   *In re N.T.*, 474 S.W.3d at 476; *In re J.D.B.*, 435 S.W.3d 452, 463 (Tex. App.—Dallas 2014, no pet.).

"'Environment' refers to the acceptability of living conditions, as well as a parent's conduct in the home."   *In re J.E.M.M.*, 532 S.W.3d 874, 881 (Tex. App.—Houston [14th Dist.] 2017, no pet.); *see In re J.D.*, 436 S.W.3d 105, 114 (Tex. App.—Houston [14th Dist.] 2014, no pet.).   Inappropriate, abusive, or unlawful conduct by a parent or other persons who live in the child's home can create an environment that endangers the physical and emotional well-being of a child as required for termination under subpart D.   *See In re J.E.M.M.*, 532 S.W.3d at 881 (holding that evidence that father did not live with mother and child and failed to protect child from mother's drug use and abusive conduct was sufficient to show endangerment); *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.) (same).   Termination under § 161.001(1)(D) is permitted "because of a single act or omission."   *A.S. v. Tex. Dep't of Family & Protective Servs.*, 394 S.W.3d 703, 713 (Tex. App.—El Paso 2012, no pet.); *see In re R.D.*, 955 S.W.2d 364, 367 (Tex. App.—San Antonio 1997, pet. denied).

"Termination under (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent." *In re S.R.*, 452 S.W.3d 351, 361 (Tex. App.—Houston [14th Dist.] 2014, pet. denied); *In re M.J.M.L.*, 31 S.W.3d 347, 351 (Tex. App.—San Antonio 2000, pet. denied).   A court properly may consider actions and inactions occurring both before and after a child's birth to establish a "course of conduct."   *In re A.L.H.*, 515 S.W.3d 60, 91 (Tex. App.—Houston [14th Dist.] 2017, pet. denied); *In re S.M.*, 389 S.W.3d 483, 491–92 (Tex. App.—El Paso 2012, no pet.).   "The specific danger to the children need not be established

16

independently, but rather may be inferred from the parental misconduct." *Porter v. Tex. Dep't of Protective & Regulatory Servs.*, 105 S.W.3d 52, 58 (Tex. App.—Corpus Christi–Edinburg 2003, no pet.). As a general rule, subjecting children to a life of uncertainty and instability endangers the children's physical and emotional well-being. *See In re A.R.O.*, 556 S.W.3d 903, 910 (Tex. App.—El Paso 2018, no pet.); *In re C.J.S.*, 383 S.W.3d 682, 689 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied).

At the time A.J.S. was removed, A.J.S. was found with friends of Mother, a couple who were intoxicated. The man was a registered sex offender and the couple's children had been removed by the Department. Mother denied knowing that the man was a sex offender. The Department was unable to locate Mother after they picked up A.J.S. Moreover, despite the protective order that prohibited M.P. from being around A.J.S., Mother left A.J.S. in M.P.'s care, and continued to see M.P. with A.J.S. Mother's conduct in leaving A.J.S. with inappropriate caregivers supports a finding that she endangered A.J.S.'s wellbeing. *See In re A.S.*, 394 S.W.3d at 712 ("Conduct of a parent or another person in the home can create an environment that endangers the physical and emotional well-being of a child as required for termination under Subsection D.").

During the course of these proceedings and Mother's visits with A.J.S., the foster parents and the social workers testified that Mother usually smelled like cigarette smoke. Mother was advised at least by the first day of trial in October 2018 that smoke causes A.J.S. to become congested, to have a constantly runny nose, and to have trouble breathing. Yet, when Mother returned A.J.S. from unsupervised visitation, A.J.S. usually smelled of cigarette smoke. Although Mother testified in March 2019 that she only

17

smoked outdoors and never around A.J.S, she admitted she had not stopped smoking, but she testified that she limited her cigarettes to two a day, vaped, and used nicotine gum. Because of A.J.S.'s reaction to smoke (including fumes from vaping),[4] irritants that worsen A.J.S.'s asthma, two physicians testified that A.J.S.'s heath is endangered with possible permanent effects on her lung development by exposure to smoke. Furthermore, the environment that Mother proposes to have A.J.S. visit or live in is a one-bedroom shared apartment that has a heavy odor of smoke and full ashtrays inside. Continued exposure of A.J.S. to second-hand smoke also supports a finding of physical endangerment to A.J.S. under subpart D. *See In re G.R.W.*, 191 S.W.3d 896, 900–01 (Tex. App.—Texarkana 2006, no pet.) (affirming appointment of nonparental conservators based in part on endangering conduct of parent who smoked around child with "severe respiratory problem")[5]; *In re K.R.P.*, 80 S.W.3d 669, 676 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (considering a parent's smoking inside home and around child with asthma and allergies in determining that parent's appointment as managing conservator would significantly impair the child's physical health and emotional development).

Mother's uncertain housing, decades-long history of drug use and relapse during

---

[4] Dr. Santiago Encalda, a pediatric pulmonologist, testified that the fumes from vaping can cause bronchospasms in asthma patients the same as cigarette smoke.

[5] The Texarkana court considered as evidence of harm to the child:

Every week when G.R.W. returns from being at the Alexander/Sykes home, he has symptoms indicating he has been around cigarette smoke: coughing, runny nose, and wheezing. After about a week at the Harrises' home, G.R.W. is back to normal; but then it is time for him to return to the Alexander/Sykes home. And the situation repeats. In fact, G.R.W. has not been really well since he has been visiting the Alexander/Sykes home. . . . . usually when G.R.W. returns from the Alexander/Sykes home, he smells like smoke.

*In re G.R.W.*, 191 S.W.3d 896, 901, 902 (Tex. App.—Texarkana 2006, no pet.)

these proceedings, as well as her failure to comply with the drug testing requirements of the program also endanger A.J.S.'s well-being. *See In re A.R.O.*, 556 S.W.3d at 911 (mother's history of homelessness, failing to maintain regular visitation, and leaving child with inappropriate or incompetent caregivers supported finding of physical and emotional endangerment under subpart (E)).

We find legally and factually sufficient evidence to support the trial court's finding by clear and convincing evidence that Mother's conduct and the environment in which she placed A.J.S. endangered A.J.S.'s physical well-being. *See* TEX. FAM. CODE ANN. §§ 161.001(b)(1)(D), (E). Because we hold the evidence of endangerment pursuant to §§ 161.001(b)(1)(D), and (E) to be both legally and factually sufficient, we need not address the remaining grounds. *See In re N.G.*, 2019 WL 2147263, at *6 n.1, *In re A.V.*, 335 S.W.3d 355, 361 (Tex. 2003); *see also* TEX. R. APP. P. 47.1.

We overrule Mother's first issue.

### III.    BEST INTEREST OF THE CHILD

By her second issue, Mother challenges the sufficiency of the evidence to support the trial court's finding that A.J.S.'s best interests would be served by terminating Mother's parental rights. The standards of review outlined in Part II(A) apply to this issue as well.

"[T]here is a strong presumption that a child's interest is best served by preserving the conservatorship of the parents; however, clear and convincing evidence to the contrary may overcome that presumption." *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). A best-interest determination is guided by several non-exclusive factors, including: (1) the child's emotional and physical needs; (2) the emotional and physical danger to the child now and in the future; (3) the parental abilities of the individuals

19

seeking custody; (4) the plans for the child by those individuals and the stability of the home; (5) the plans for the child by the agency seeking custody and the stability of the proposed placement; (6) the parent's acts or omissions that may indicate the existing parent child relationship is improper; and (7) any excuse for the parent's acts or omissions. *In re A.C.*, 560 S.W.3d at 631. "Proof of acts or omissions providing grounds for termination under section 161.001(b)(1) does not relieve the petitioner from proving the best-interest element, but the same evidence may be probative of both." *Id.* at 631–32.

## A. Child's Needs

A.J.S. was two and a half years' old at the time of trial. She was removed when she was less than a year old. The need for permanence is a paramount consideration for a child's present and future physical and emotional needs. *In re D.A.Z.*, No. 08-18-00124-CV, ___ S.W.3d ___, 2018 WL 6722338, at *4 (Tex. App.—El Paso Dec. 21, 2018, no pet.); *In re R.A.G.*, 545 S.W.3d 645, 653 (Tex. App.—El Paso 2017, no pet.).

Mother's housing has historically been unstable. Her living arrangement at the end of trial was only six weeks old and her previous housing had been in shelters. Mother also had no stable support system and was estranged from her family.

According to two physicians, A.J.S. needed to live in a smoke-free environment that did not aggravate her asthma and that would allow her lungs to develop as fully and normally as possible. In addition, she needed access to medical care including someone with the ability to call for help and appointments, as well as transportation to medical appointments. Mother had difficulty keeping appointments during the eighteen months from A.J.S.'s removal until final order. Not all of her difficulties were related to a

20

lack of transportation; sometimes she missed visitation at her home with A.J.S. simply because she overslept and did not walk outside to meet A.J.S. Transportation and telephone access were ongoing challenges for Mother, even when she was provided with free bus passes.

A.J.S. had spent little time with her mother since her removal at nine months' old and Mother did not regularly attend scheduled visitation. All children need food, clothing, stable housing, and a substitute caregiver when their parent is not available. Mother had no support system, and there was no evidence that Mother's roommate, whom she had known for only a couple of months, was an appropriate caregiver for A.J.S. when Mother was working or ill. The child's needs weigh in favor of termination. *See In re J.L.*, 163 S.W.3d 79, 87 (Tex. 2005) (holding that evidence of financial difficulties, unstable living conditions, and little or no support system favored the jury's finding that termination was in child's best interest).

## B. Emotional and Physical Danger to the Child Now and in the Future

Mother completed her parenting classes and appeared to be drug free at the time of trial, although she had not performed any requested drug testing for months before the end of trial. For much of her life, Mother had not successfully taken care of her own mental or physical health or housing needs. She had no stable employment history before her four-month-old job at Goodwill. Her two older daughters were removed and her rights to them were terminated. Mother also had an older son that she gave up for adoption years before because she could not care for him. Mother subjected A.J.S. and her other children to unstable living arrangements, left A.J.S. and her two older daughters with inappropriate caregivers, and continued to use drugs while they were with her and

21

during termination proceedings. "A parent who lacks stability, income, and a home is unable to provide for a child's emotional and physical needs." *In re Z.M.*, 456 S.W.3d 677, 689 (Tex. App.—Texarkana 2015, no pet.).

Mother repeatedly made poor choices for substitute caregivers for A.J.S. She left her with M.P., a drug user, and with friends who were under the influence of drugs or alcohol and whose own children had been removed. Mother continued to expose A.J.S. to smoke-filled environments even though Mother had been made aware of the dangers such environments pose to A.J.S.'s ability to breathe and her long-term lung development and health.

Mother's historical choices of companions who were unsuitable to be around her children, past and present, her long history of drug use, her history of unstable living situations, and her historical lack of stable employment, make this factor weigh in favor of termination. "Evidence of past misconduct or neglect can be used to measure a parent's future conduct." *Id.*; *Williams v. Williams*, 150 S.W.3d 436, 451 (Tex. App.—Austin 2004, pet. denied).

## C. Proposed Placement

A.J.S. has been in foster care with a prospective adoptive family, has adjusted well, and has bonded with them. "Evidence that a child is well-cared for by the foster family, is bonded to the foster family, and has spent minimal time in the presence of a parent is relevant to the best interest determination . . . ." *See In re R.A.G.*, 545 S.W.3d at 653. Her foster parents have previously raised two children who are now young adults. A.J.S. lives in a smoke-free environment, her medical needs are being met, and she began seeing a pediatric pulmonologist. In addition, her foster mother is friendly

with A.J.S.'s grandmother who has custody of A.J.S.'s half-siblings with whom she has developed a relationship. The family is stable and A.J.S. is doing well in day care and at home. *See In re J.W.M.*, 153 S.W.3d 541, 548–49 (Tex. App.—Amarillo 2004, pet. denied) ("While the prospect of adoption into a stable home cannot alone be said to be a determinative factor, it clearly is among the factors the court properly could consider."). This factor weighs in favor of termination.

## D.     Parental Acts, Omissions, and Excuses

Mother subjected A.J.S. to an unstable environment while using drugs and being around drug users for the first year of A.J.S.'s life. Even after Mother finished drug rehabilitation, she relapsed and continued to maintain relationships with drug users. *See In re X.R.L.*, 461 S.W.3d 633, 640 (Tex. App.—Texarkana 2015, no pet.) (holding that evidence of drug use during the course of termination proceedings is relevant to parenting abilities).

After Mother completed a drug relapse program, she lived in shelters until approximately six weeks before the final day of trial. Mother obtained help for her mental health issues and was on multiple medications that she testified helped a lot. Mother was thirty-five years old at time of trial and had abused drugs since she was approximately thirteen years old, despite substantial involvement with the Department from 2006 to 2010 and again in 2017 and 2018. The Department's witnesses expressed concern that Mother's sobriety was still new and they were also concerned about her ability to maintain stable housing. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009) ("[E]vidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of . . . irresponsible choices."); *see also In re B.D.M.*, No. 02–13–00388–

23

CV, 2014 WL 1510131, at *8 (Tex. App.—Fort Worth Apr. 3, 2014, no pet.) (mem. op.) ("[R]ecent improvement alone is not sufficient to avoid termination of parental rights."). This factor weighs in favor of termination.

**E.    Summary**

Considering all of the evidence in the light most favorable to the trial court's verdict, we conclude that the evidence is legally sufficient because a reasonable trier of fact could form a firm belief or conviction that termination was in the best interest of A.J.S.   *See In re J.F.C.*, 96 S.W.3d at 266.   We conclude the evidence is factually sufficient because the disputed evidence is not so significant it would prevent a reasonable factfinder from forming a firm belief or conviction that termination was in A.J.S.'s best interests.   *See In re P.R.W.*, 493 S.W.3d 738, 747 (Tex. App.—Corpus Christi–Edinburg 2016, no pet.).

Mother's second issue is overruled.

### IV.    CONCLUSION

We affirm the judgment of the trial court.


GINA M. BENAVIDES,
Justice


Delivered and filed the
1st day of August, 2019.

24